LAW OFFICE OF

# MICHAEL K. BACHRACH

276 FIFTH AVENUE, SUITE 501
NEW YORK, N.Y. 10001
--------------
TEL. (212) 929-0592 • FAX. (866) 328-1630

MICHAEL K. BACHRACH *                                   http://www.mbachlaw.com
* admitted in N.Y., MN and D.C.                          michael@mbachlaw.com

February 7, 2017

**By ECF**
**Hard copy to follow by mail**

The Hon. Valerie E. Caproni
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

*Re: United States v. Daryl Whitley,*
*15 Cr. 537 (VEC)*

## DEFENDANT'S SENTENCING MEMORANDUM

Dear Judge Caproni:

This letter is submitted for Your Honor's consideration in the sentencing of the defendant, Daryl Whitley, in the above-referenced matter.  After reviewing the facts set forth below, as well as the mitigation report prepared by The Consulting Project (see Exhibit B) and the letters drafted on Mr. Whitley's behalf (see Exhibit A), it is requested that this Court fashion a fair and just sentence that complies with the purposes of sentencing.[1]  This is Mr. Whitley's first criminal conviction, and to date he has served nearly 13-months imprisonment since his initial arrest.  As such, and for all the reasons that follow, we respectfully suggest that a sentence of "time served" is a reasonable disposition in this case.

## I.     Charge and Conviction

On September 9, 2016, Daryl Whitley pleaded guilty before the Hon. Barbara C. Moses, United States Magistrate Judge, to Count 1 of the Eighth Superseding Indictment, which had charged Mr. Whitley and 35 of his co-defendants with being a member or associate of the Young Gunnaz ("YGz") racketeering enterprise.  Importantly, while some defendants were charged with drug trafficking and crimes of violence as severe as murder, Mr. Whitley's role in this case was quite isolated and much less severe.  Mr. Whitley was not required to plead guilty to being a *member* of the YGz, only to *associating* with them in relation to his specific activity.  See Transcript of Plea Hearing, dated, September 9, 2016 (hereinafter cited as, "P.Tr."), at 26 (the

---

[1]     We note that the publicly filed versions of Exhibits A and B have been partially redacted to protect the identity of minors.  An unredacted copy of these exhibits will be provided to this Court under seal, and will be made available to the Government upon request.

The Hon. Valerie E. Caproni
February 7, 2017
Page 2 of 15

Government proffering: "We would … establish through cooperating witness testimony that Mr. Whitley was an associate of the YGs, not a member but an associate who knew them, associated with them, and agreed to participate with several of them in a plot to rob banks north of the Bronx, in Westchester and other counties.").

Indeed, Mr. Whitley's association with the YGz enterprise did not involve drugs or murder, rather his role was confined to the bank robberies.  See PSR at ¶¶ 20, 66, 73, 101. Moreover, even in relation to the bank robbery conspiracy, although he understood and agreed that other members of the conspiracy would commit additional bank robberies, Mr. Whitley only participated in a single bank robbery, see PSR at ¶¶ 73, 101, and his role was that of the getaway driver.  Thus, while we certainly do not dispute the severity of Mr. Whitley's offense, we note that his role in the offense was minimal in comparison to his co-defendants.

As explained in the Government's letter, dated, January 5, 2017, which was submitted by the Government "to provide information to aid the Court, the defendants, and their counsel in comparing the relative culpability of each of the defendants in the charged racketeering conspiracy," Mr. Whitley is listed in the final paragraph of the last and final tier of defendants (i.e., the Eighth Tier), which, in the Government's words, means that Mr. Whitley is in the tier of defendants "being the least culpable relative to their co-defendants".  See Gov't letter, dated, January 5, 2017, at 1; see also id. at 10.

In language specifically approved by the Government in advance of Mr. Whitley's plea hearing, Mr. Whitley allocuted and thus was convicted of the following conduct:

> In or about January 2016, in the Southern District of New York, I participated in a racketeering conspiracy with members of the YG racketeering enterprise.  As charged in Count One of my superseding indictment, the YGs is a gang based in the Bronx.
>
> Specifically, I learned that several YG members had been working together on the part of the conspiracy to rob banks.  I knowingly and voluntarily agreed with YG members to become a part of that conspiracy.  As part of that agreement, I conspired to rob a bank in the vicinity of Yorktown, New York, in Westchester County[. O]n or about January 29, 2016[,] I participated in the robbery of that bank.  While I did not personally participate in other robberies of banks, I understood and I agreed that other members of this conspiracy would commit robberies of other banks.

P.Tr. 24-25.  The Government then proffered an additional fact that the defense does not dispute but that was outside the knowledge of the defendant, "The government proffers that the banks that were victimized by this robbery conspiracy did business in interstate commerce and they were insured by the FDIC."  P.Tr. 25.

The Hon. Valerie E. Caproni
February 7, 2017
Page 3 of 15

## II.     Objections to the Pre-Sentence Report ("PSR")

The Probation Department calculated Mr. Whitley's Total Offense Level as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §§ 2E1.1[a][2], 2B3.1[a]) | 20 |
| Specific Offense Characteristics: Taking of property from | |
| a financial institution (U.S.S.G. § 2B3.1[b][1])[2] | +2 |
| Victim Related Adjustment: None. | 0 |
| Adjustment for Role in the Offense: None. | 0 |
| Adjustment for Obstruction of Justice: None. | 0 |
| Adjusted Offense Level (Subtotal) | 22 |
| Acceptance of Responsibility (U.S.S.G. §§ 3E1.1[a],[b]) | -3 |
| Total Offense Level | 19 |

(Revised Pre-Sentence Report, dated, December 15, 2016 [hereinafter, "PSR"], at ¶¶ 103-112.)

Mr. Whitley's only prior conviction is for the New York State offense of Disorderly Conduct in violation of NY Penal Law § 240.20.  Disorderly Conduct is a violation, not a crime, under New York State law, and as such qualifies only as a "petty offense[]" under the United States Sentencing Guidelines.  See U.S.S.G. § 4A1.2(c).  Since Mr. Whitley did not receive "a term of probation of more than one year or a team of imprisonment of at least thirty days," nor was his "prior offense similar to the instant offense," no criminal history points are awarded.  See U.S.S.G. § 4A1.2(c)(1).  As such, Mr. Whitley's possesses zero criminal history points, and thus a Criminal History Category of I, under the Sentencing Guidelines.

With a Total Offense Level of 19 and a Criminal History Category of I, Mr. Whitley's recommended Sentencing Guideline range is 30-37 months.  We have no objections to this calculation, though we ask the following minor errors be corrected before Mr. Whitley's Pre-Sentence Report is submitted by the Probation Department to the Bureau of Prisons:

(1) On the cover page of Mr. Whitley's PSR (page 2 of filed PDF), under "Release Status" Mr. Whitley's date of arrest is incorrectly listed as June 29, 2016.  The correct arrest date is January 29, 2016.  The June date is merely the date that he was transferred to Federal custody.  This should be corrected to accurately reflect his date of arrest.

(2) Para. 26 states that sentencing is scheduled for January 10, 2017.  That date has since been changed.  The paragraph should be updated to reflect Mr. Whitley's correct sentencing date, which is February 21, 2017.

(3) Para. 27 lists, inter alia, the "Status of Codefendant(s)".  Several co-defendants have been sentenced since this draft of the PSR was filed.  As such, we ask that the following dispositions be updated:

---

[2]     The Probation Department states that this enhancement is pursuant to U.S.S.G. § 2E3.1 rather than 2B3.1. We assume this was merely a typo.

The Hon. Valerie E. Caproni
February 7, 2017
Page 4 of 15

| Def. No. | Defendant | Disposition |
|----------|-----------|-------------|
| 5 | Anthony Scott | 276-months imprisonment |
| 12 | Briant Lamont Maynor | 60-months imprisonment |
| 15 | Joseph Anderson | 48-months imprisonment |

The Government has identified Anthony Scott as a Tier Three Defendant, Briant Lamont Maynor as a Tier Seven Defendant, and Joseph Anderson as a Tier Eight Defendant. The Government has also stated that Scott, Maynor, and Anderson were all "mid-level" members of the YGz, see Gov't Letter, dated, January 5, 2016, at 4, 8, 9, whereas Mr. Whitley was not a member of the YGz gang at all, see P.Tr. 26.[3]

(4) Para. 66 lists Mr. Whitley's conduct under a section of his PSR titled, "Overt acts committed by YGz members" (emphasis added). We respectfully submit that Mr. Whitley's conduct should be moved to a later section section of his PSR and/or corrected to note that while his conduct (i.e., the January 29, 2016 bank robbery) may have been an Overt Act in support of the racketeering conspiracy, Mr. Whitley was a mere associate of the YGz enterprise, not a YGz member. See P.Tr. 26; see also n.2, supra.

(5) Para. 95 states, "On June 29, 2016, DARRYL WHITLEY was arrested by law enforcement authorities." That date is incorrect. As stated above, Mr. Whitley was arrested on January 29, 2016, whereas on June 29, 2016 he was merely transferred from State custody to Federal custody. This should be corrected accordingly.

(6) Para. 104 lists the incorrect Sentencing Guideline applicable to the specific offense characteristic described. As explained supra at n.1, the Guideline in question should be listed as U.S.S.G. § 2B3.1(b)(1), not § 2E3.1(b)(1). We assume this is merely a typographical error, since § 2B3.1 relates to robbery whereas § 2E3.1 relates to gabling and animal fighting offenses. As such, the typographical error should be corrected accordingly.

(7) Para. 123 indicates that Mr. Whitley's sister, Tiffany Futch, works at "either the New York Post or the New York Times." Neither is correct. We have spoken to Ms. Futch and she has informed us that she is employed by the NY Life Insurance Company. As such, we ask that this error be corrected as well.

(8) Para. 125 indicates that Mr. Whitley has been visited by his six-year-old son once during the period of his present detention. Mr. Whitley was recently visited a second time by his son. As such, we ask that this paragraph be updated.

---

[3]     On page 10 of the Government's January 5, 2017 letter, the Government incorrectly states that Mr. Whitley was a "low-level" member of the YGz gang. This is incorrect and also inconsistent with the proffer made by the Government to the Court at Mr. Whitley's plea hearing. See P.Tr. 26. We have spoken to the Government about this inconsistency, and they have confirmed that their letter was in error and the proffer made by the Government at Mr. Whitley's plea hearing accurately reflects his involvement as an associate, rather than a member, of the enterprise.

The Hon. Valerie E. Caproni
February 7, 2017
Page 5 of 15

(9) Para. 127 misstates the name of Mr. Whitley's girlfriend.  Her name is, "Sharlynn Vasquez," nor "Chadene Vasquez."  As such, we ask that this error be corrected.

(10)    Para. 132 discusses Mr. Whitley's prior history of substance abuse and the fact that since being arrested for the present offense he has remained clean and sober throughout his period of detention.  The paragraph twice misstates the date of his arrest as "June 2016" rather than "January 2016", or, even more specifically, "January 29, 2016".  As such, we ask that both references to "June 2016" be corrected to "January 29, 2016" to accurately reflect that Mr. Whitley's sobriety has now lasted over a year.

(11)    Finally, Mr. Whitley's name is misspelled throughout his PSR.  To ensure that his name is spelled correctly in as many sources as possible, we ask that Mr. Whitley's PSR be revised throughout to note the correct spelling of his name, "Daryl Whitley". We note that we had provided the correct spelling of Mr. Whitley's name to the Probation Department during his Pre-Sentence Interview.

## III.    Post-Booker Sentencing Framework and the Parsimony Clause

As is now well known, in Kimbrough v. United States, 128 S.Ct. 558, 570 (2007), the Supreme Court re-affirmed the sentencing regime announced in United States v. Booker, 534 U.S. 220 (2005), which requires District Courts to view the Guidelines as merely advisory, and instructs District Courts to tailor a sentence in light of all of the statutory concerns set forth in 18 U.S.C. § 3553(a).  Under 18 U.S.C. § 3553(a), District Courts are directed to impose the minimally-sufficient sentence to achieve the statutory purposes of punishment – justice, deterrence, incapacitation, and rehabilitation – by imposing a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2).  See Kimbrough, 128 S.Ct. at 570.  This "parsimony provision" is "an overarching provision," representing a cap above which a District Court is statutorily prohibited from sentencing above, even when a greater sentence is recommended by the advisory Sentencing Guidelines.  To put it another way, pursuant to 18 U.S.C. § 3553(a), the Guidelines are to be viewed as statutorily subordinate to the parsimony clause.  See Kimbrough, 128 S.Ct. at 570; see also United States v. Ministro-Tapia, 470 F.3d 137, 142 (2d Cir. 2006) ("if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not, consistent with the parsimony clause, impose the higher").

Similarly, other statutory provisions also give the District Court direction in sentencing. Under 18 U.S.C. § 3582, imposition of a term of imprisonment is subject to the following limitation: In determining whether and to what extent imprisonment is appropriate based on the Section 3553(a) factors, the court is required to "recogniz[e] that imprisonment is not an appropriate means of promoting correction and rehabilitation" (emphasis added).  Further, under 18 U.S.C. § 3661, "no limitation shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence" (emphasis added).

The Hon. Valerie E. Caproni
February 7, 2017
Page 6 of 15

**IV.**   **Mr. Whitley's Background and Personal Characteristics**

**A.**   **This is Mr. Whitley's first criminal conviction**

Mr. Whitley is 25 years old, he has a six-year-old son, and, as will be discussed below, has struggled through various obstacles.  Notably, this is Mr. Whitley's first criminal conviction, and, in the Government's own words, Mr. Whitley is in the tier of defendants "being the least culpable relative to their co-defendants".  See Gov't letter, dated, January 5, 2017, at 1; see also id. at 10.

Thus, at the outset, we note that when considering the arguments presented below, as well as those presented in the mitigation report submitted by The Consulting Product and the numerous letters provided by Mr. Whitley's family and friends, we ask that this Court keep in mind the importance of the fact that this is Mr. Whitley's first and only criminal conviction. This is particularly important to Mr. Whitley's Section 3553(a) analysis given the fact that the United States Sentencing Commission has proposed the creation of a new Chapter Four Sentencing Guideline that may have been automatically applicable to Mr. Whitley if he were being sentenced on November 1, 2017 or thereafter.  See Proposed Amendment 1 (First Offenders/Alternatives to Incarceration), Proposed 2017 Amendments to the Federal Sentencing Guidelines (December 19, 2016).

Specifically, in relevant part, the Sentencing Commission has proposed the creation of a new Guideline that would provide lower sentencing ranges for "first offenders". That new Guideline, U.S.S.G. § 4C1.1, has been proposed to read in one of two ways as follows:

§ 4C1.1. First Offender

(a) A defendant is a first offender if [(1) the defendant did not receive any criminal history points from Chapter Four, Part A, and (2)] the defendant has no prior convictions of any kind.

**[Option 1:**
(b) If the defendant is determined to be a first offender under subsection (a), decrease the offense under Chapters Two and Three by [1] level.**]**

**[Option 2:**
(b) If the defendant is determined to be a first offender under subsection (a), decrease the offense level as follows:

(1) if the offense level determined under Chapter Two and Chapter Three is less than level [16], decrease by [2] levels; or

(2) if the offense level determined under Chapters Two and Three is level [16] or greater, decrease by [1] level.**]**

The Hon. Valerie E. Caproni
February 7, 2017
Page 7 of 15

The Sentencing Commission is also considering whether to broaden the definition of first offenders under this new Guideline to include "defendants who have prior convictions that are not used in computing criminal history points under Chapter Four (e.g., sentences resulting from foreign or tribal court convictions, misdemeanors and petty offenses listed in § 4A1.2(c))." Proposed Amendment 1 (First Offenders/Alternatives to Incarceration), Proposed 2017 Amendments to the Federal Sentencing Guidelines (December 19, 2016), at 8, Issue #1, Issues for Comment.  Mr. Whitley's only prior conviction is for violation-level Disorderly Conduct, which is considered a "petty offense" under U.S.S.G. § 4A1.2(c).  As such, Mr. Whitley will qualify as a "first offender" under this proposed new Guideline if the definition of first offenders is broadened in the manner still under consideration.

The Sentencing Commission's new Guideline will not become effective, in any form, until November 1, 2017.  However, there appears to be a possibility that once effective offenders similarly situated to Mr. Whitley will automatically receive a 1-point reduction to their Base Offense Level – a reduction which would not be a matter of discretion or plea negotiation.  As such, we ask that this Court consider the Sentencing Commission's proposal as a mitigating factor under 18 U.S.C. § 3553(a).

**B.      Mr. Whitley's formative years and outlook for the future**

In order to fully understand Daryl Whitley, it is necessary to explore the events that affected him and his family during his formative years.  Indeed, though not an excuse, Mr. Whitley has suffered from mental health issues from a very young age, and then lost his father to lengthy incarceration leaving him with the additional hurdle of not merely a lack of fatherly support, but also a negative influence seared into his mind.  That being said, there are two sides to Mr. Whitley.  The child who lost his father (and friends) to prison, and the young man who transformed himself – not perfectly, but still positively – after the birth of his son.

Mr. Whitley was born into poverty, raised by a single mother of five children in the South Bronx.  He began school with pre-K at four years old, and his teachers quickly noticed Mr. Whitley's propensity for inattention and hyperactivity.  His early education was hampered by his increasing behavioral issues that fed into his learning disabilities.  By first grade, when he was only six years old, he was formally diagnosed as being learning disabled, and as having "Attention Deficit Disorder", now referred to as "Attention Deficit Hyperactivity Disorder" ("ADHD"), see American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, (Fifth ed. 2013) ("DSM-5"), and was prescribed Ritalin.  In an effort to help Mr. Whitley break through his anxiety and hyperactivity, at age seven or eight his mother enrolled him in gymnastics; an experience he still talks about positively to this day.

Throughout Mr. Whitley's childhood, however, his father was consistently in and out of jail struggling through his own downward spiral.  Due primarily to financial reasons, after a few years Mr. Whitley stopped receiving his ADHD medication.  Right around that time, when he was 10 years old and in fifth grade, his father was convicted of second degree murder, which resulted in a sentence of 22 years to life imprisonment.  Although Mr. Whitley has visited his father many times in jail, he has not spent any time with his father outside of jail since that time.

It should not be surprising that losing a father to incarceration at such a young age, while already struggling with mental health issues of his own, did not aid positively in Mr. Whitley's development.  He continued to experience emotional distress during his formative years when his maternal grandfather passed away from cancer in 2002. This was especially difficult for Mr. Whitley as he was only eleven years old and his grandfather was the closest male role model that still lived with him and his mother.

Mr. Whitley's emotional challenges continued when, approximately four years later, his younger sister and closest sibling, Darylnique, was diagnosed with uterine cancer at age 11.  The ordeal was emotionally difficult on the entire family as they watched her lose excessive weight and experience hair loss due to chemotherapy treatments.  Thankfully, Darylnique survived, and indeed has provided a moving letter in support of Mr. Whitley's sentencing (see Exhibit A).

The Honorable Jack B. Weinstein, United States District Court Judge for the Eastern District of New York, has observed how chaotic environments and adverse socioeconomic conditions affect children and their relationship with the criminal justice system:

> Had the defendants been raised by cohesive, adequate families, most of the difficulties they encountered would probably never have come to pass.  Well-resourced, attentive parents would have had the knowledge, ability, and insight to protect their children from many of the difficulties that befell these defendants in their youth, to obtain assistance to deal with their psychological and physical problems, and to obtain crucial opportunities for education, work, and personal growth.  Even those with learning disabilities would likely have been provided available resources to overcome their impairments at public expense.   That the defendants were born into circumstances without such support is at the center of this tragedy.

United States v. Bannister, 786 F.Supp.2d 617, 688-89 (EDNY 2011).

Mr. Whitley was raised in the Mott Haven-Hunts Point section of the Bronx.  Mott Haven and Hunts Point, like other economically depressed areas of our nation, is characterized by "communal resources [that] are scarce … residents [who] often face other significant obstacles to prosperity, such as a dearth of employment and educational opportunities, high crime rates, and poor housing quality."  Citizens' Committee for Children of New York, *Concentrated Poverty in New York City: An Analysis of the Changing Geographic Patterns of Poverty* (April 2012) (available at <http://www.cccnewyork.org/wp-content/publications/CCCReport.Concentrated Poverty.April-2012.pdf>) (last accessed, February 6, 2017).  In fact, as of 2010, Mott Haven-Hunts Point had a poverty rate of 41.1%.  Id.  Further, Mott Haven-Hunts Point has the highest number of residents, 25 or older who have completed the fewest years of education, with 28% of the residents having some high school but no diploma.  See New York City Department of Health and Mental Hygiene, *Community Health Profiles: Hunts Point and Mott Haven, The*

The Hon. Valerie E. Caproni
February 7, 2017
Page 9 of 15

*Bronx* (2d ed. 2006) (available at <https://www1.nyc.gov/assets/doh/downloads/pdf/data/2006chp-107.pdf>) (last accessed, February 6, 2017).

Poor and violent environments can cause devastating psychological trauma on a child's development, including but not limited to: hopelessness, depression, aggression, impulsivity, delinquency and a reliance on gangs to counteract feelings of despair and powerlessness. See Berson, Hernon, and Pearsall, *Preventing Children's Exposure to Violence: The Defending Childhood Initiative*, NIJ Journal, Issue No. 270 (June 2012) (available at <https://www.ncjrs.gov/pdffiles1/nij/238485.pdf> and <https://www.justice.gov/defendingchildhood/selected-publications-and-research>) (last accessed, February 6, 2017). Pervasive hopelessness has characterized the Mott Haven and Hunts Point sections of the Bronx.

Throughout his adolescence, Mr. Whitley watched many young men in his South Bronx neighborhood succumb to gang violence, drugs, and guns. Mr. Whitley knew not to make those same mistakes, because, in his own words, "I just knew it was not my type of life." Still, the violence surrounding him was a particular struggle for him to deal with due to his mental health issues.

Mr. Whitley dropped out of school when he was approximately 16 or 17 due to continued behavioral issues and poor grades. Indeed, he continued to experience difficulty with other educational pursuits, and in maintaining employment throughout adolescence and into early adulthood. Notably, however, Mr. Whitley is aware of the difficulties that his mental health disorder poses, and he has requested assistance – as part of his terms of supervised release – to be permitted to participate in services where he can receive counseling and work-related training in order to achieve long-term self-sufficiency.

Indeed, as a young man Mr. Whitley developed a dependence on Xanax, which he used to self-medicate for his ADHD. His overuse of Xanax culminated in an evening where it appears that he may have been sexually assaulted while unconscious at a party, an experience that still bothers him greatly to this day – both because of what occurred and because he cannot even remember it. As such, Mr. Whitley would welcome substance abuse counseling as well as therapy and other mental health treatment as part of his terms of supervised release.

While Mr. Whitley takes full responsibility for his actions, it cannot be ignored that we are all the product of where and how we are raised. The loss of a father and friends to prison, early onset of mental disorder and later substance abuse forming out of self-medicating for his mental disorder, coupled with a hopeless and destructive environment, damaged the foundation required for intelligent life choices as Mr. Whitley matured.

That being said, amidst the hopelessness, poverty and dysfunction, remains a man worthy of redemption. Mr. Whitley is not a lost soul, not by any means. He made a mistake, but he continues to possess the love and support of his mother, son, sisters, and other family and friends. Attached to this sentencing memorandum are ten letters all showing that when released from incarceration he will return to family and friends offering him their open arms and willing to do whatever they can to support him in the future so that this remains his first and only

criminal offense.  <u>See, generally</u>, Exhibit A.  Once one reads these letters it becomes easy to see why there is a legitimate hope for Mr. Whitley's future.

In that regard, it is worth reflecting upon the fact that often times the measure of a man is not simply the specific acts he has done, but the impact he has on other's lives.  His mother, sisters, friends, and even former teachers have written Your Honor to explain who Mr. Whitley is to them, and that they all believe there is hope for him in the future.

Each letter speaks of Mr. Whitley's close relationship with his family, including his son, and how good a person Mr. Whitley is notwithstanding his crime – which notably not one person attempts to minimize or deny.  For example, a family friend, Sheana Smith, reflects the feelings of Mr. Whitley's family and Mr. Whitley himself as she states:

> I know that Daryl is extremely remorseful and willing to do whatever it may take to make reparations.  I believe Daryl is ready to lead by example because he knows that his son deserves that and much more.  I hope that he is given the opportunity to turn is life around and drive his future in the right direction.  Most importantly, I believe that this is Daryl's opportunity to break the cycle not only for himself, but for his son and his son's future.

(Exhibit A at 6.)

Tiffany Futch, Mr. Whitley's oldest sister, writes:

> Daryl and I are extremely close and it hurts me to see him locked away for a year especially knowing how close and how involved he is in his 6 year old son's life.  My brother grew up without his father in his life because he also is incarcerated and I pray this cycle of sons not having their father present in their lives breaks starting with my brother and his child.
>
> Growing up Daryl was always shy, quiet and very much reserved.  He always expressed his love for our family by performing acts of service, for example being the one to drive us around whenever we needed him or just helping our grandmother out with her daily errands knowing he would get an ear full of life lessons but he still was there for her.
>
> I love my brother with all my heart and I know everyone makes mistakes and deserves second chances.

(Exhibit A at 1.)

Ms. Futch also notes that "[b]efore he was sent to jail he was working on getting his GED so he could get a better job to provide more for himself and his son.  I made sure to keep on him

about getting his GED because I value education and I strongly believed he asked multiple times about the classes while he was locked up but unfortunately he was told that there was a long waiting list." <u>Id.</u> The undersigned are pleased to report that Mr. Whitley is off the waiting list and is now regularly attending GED courses while being detained in the MDC. It is not clear if he will finish his classes before he is released or transferred to another facility, but he has committed himself to completing his GED as quickly as he can, because he recognizes the additional opportunities that will open up to him as soon as he receives his diploma.

To that end, upon Mr. Whitley's release it appears that he may have a job opportunity waiting for him. Ivan Jackson, the Alumni Affairs Coordinator for The Eagle Academy Foundation, a "foundation that seeks to empower had uplift urban-at risk inner city young men by helping them become civically engaged, build strong character and socio-emotional skills, and experience immersive learning practices," states that "Daryl embodies the type of Eagle that we would want to deploy in one of [our] school buildings to make an impact o[n] current students, while he gains meaningful work skills and career experience." Exhibit A at 10. Indeed, Mr. Jackson has indicated that they "would be interested in bringing Daryl on board" once his term of imprisonment is complete. <u>Id.</u>

Several other of Mr. Whitley's supporters have also noted that even without his GED he has done volunteer work for numerous organizations. <u>See</u> Exhibit A at 6 (Sheana Smith, who works as a Legislative Analyst at District Council 37, noting that Mr. Whitley "volunteered on a number of occasions during Election Day to get out the Vote."); Exhibit A at 8 (Steven Leonard, a teacher at the Eagle Academy for Young Men, discussing Mr. Whitley's work in an after-school program at Eagle Academy, noting that "Daryl was genuinely interested in helping others and provided service to our students in a consistently positive and helpful manner," and also concluding, "I have rarely met a student over the past 11 years upon whom I could rely on as much as Daryl Whitley."); Exhibit A at 9 (Gerald Kimbrough, the Community Center Director for East Side House Settlement discussing Mr. Whitley's volunteer work at the Patterson Community Center located in the South Bronx, noting that "Mr Whitley's time here at the after school helped the kids a lot. Mr. Whitely showed the kids wrong from right. Mr. Whitley express the different struggles growing up in Patterson Houses, and it's never too late to walk the right path.")

Darylnique Whitley, Mr. Whitley's younger sister, writes:

> I have known and lived with [Mr. Whitley] my whole life. Growing up my father wasn't always around. Unfortunately, we lost him to the prison system. Daryl then became the man of the house, a father figure to his younger siblings and my best friend. As the eldest child of the household he also became a provider. My mom was a single parent and struggled to take care of us. Daryl always made sure he did what he could to help out the household as well as others. He has volunteered and worked with young men.

The Hon. Valerie E. Caproni
February 7, 2017
Page 12 of 15

> Personally, he has taught me many life lessons. He taught me what it is to love and have respect for myself. He showed me how to be an outstanding parent. At a young age he became a father and proved that not all men fit the statistics of not being there for their children. He can't be the loving son, brother, father and friend I know he can be in the prison system. He is not only those things he is also a mentor to the youth. Specifically young men that look up to him. My family and I hope to help Daryl continue on the path that he started to establish for himself.

(Exhibit A at 2.)

Essence Moore, a friend of Mr. Whitley's since they were teenagers, notes in a very powerful letter:

> Daryl still possesses all the light and charm he did as a young boy. I pray every day that it never leaves him. As long as he has that and a love for his family, then he will always have a reason to strive for growth. As a friend, I have and will continue to do whatever it takes to support said growth. I believe that Daryl deserves leniency because he is an individual with so much potential and desire to reach it. He has a network of people who love him and are willing to offer resources whether they be professional references or time to contribute to his success. Above all who need him, he has a son who waits his father's return every single day.

(Exhibit A at 4.)

While these statements may only offer a glimmer into Mr. Whitley's background, the undersigned respectfully submit that the positive aspects of Mr. Whitley's background, coupled with his relatively minor role in the offense, should give this Court comfort that Mr. Whitley is deserving of a second chance.

**V.      Mr. Whitley's sentence should also be reduced an additional six months to provide him with credit for the time he served in State custody prior to being transferred to the Federal Bureau of Prisons**

Mr. Whitley was arrested on January 29, 2016, shortly after participating in the bank robbery in Yorktown, New York, for which he allocuted as part of his guilty plea. He was interrogated by local police and agents of the FBI for over three hours, all of which was recorded and provided in discovery. All the substantive questions directed towards him related to the bank robbery and the other individuals who also participated in the offense. Indeed, at the beginning of his interrogation, at the 0:01:35 point in the recording, before even being read his Miranda warnings, he is told that he is being interviewed in relation to "a robbery up in Yorktown." At approximately the 3:12:30 point in the interrogation, Mr. Whitley realized for

The Hon. Valerie E. Caproni
February 7, 2017
Page 13 of 15

the first time that he can end the interrogation simply by asking for a lawyer, at which point his interrogation ends.

Mr. Whitley was then charged in New York State court.  At the time, he was not charged with bank robbery, or for his association with members of the YGz enterprise, rather he was charged with one count of Possession of a Forged Instrument in the Second Degree in violation of NY Penal Law § 170.25 (at the time of his arrest he was found with credit cards that were believed to have been fraudulent).  Mr. Whitley was unable to make bail and as a result he was remanded to State custody, specifically the Westchester County Correctional Facility in Valhalla, New York (hereinafter, "Valhalla"), where he was held continuously until he was transferred to the Metropolitan Detention Center in Brooklyn, New York (hereinafter, "MDC Brooklyn"), on June 29, 2016, after being indicted in the present case.[4]

The Government did not incorporate the credit card allegations into Mr. Whitley's Federal indictment, however the State case was nonetheless dismissed shortly after Mr. Whitley was transferred to Federal custody.  Mr. Whitley has remained in continuous Federal custody since his transfer from Valhalla, and indeed has remained in continuous "official detention" since his arrest on January 29, 2016 – six months in State custody at Valhalla followed by nearly seven months in Federal custody at MDC Brooklyn.

18 U.S.C. § 3585(a) provides that "[a] sentence to a term of imprisonment commences on the date the defendant is received in custody awaiting transportation to, or arrives voluntarily to commence service of sentence at, the official detention facility at which the sentence is to be served."  The underlying principle of Section 3582 is that a Federal sentence commences when the defendant is received by the United States for the purpose of serving a Federal sentence.  See Pinaud v. James, 851 F.2d 27 (2d Cir. 1988); Salley v. United States, 786 F.2d 546 (2d Cir. 1986).  18 U.S.C. § 3585(b)(1), however, provides that "[a] defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences … as a result of the offense for which the sentence was imposed … that has not been credited against another sentence."

There is no question that Mr. Whitley's time served in State custody at Valhalla constitutes "official detention" for purposes of 18 U.S.C. § 3582(b)(1).  There is also no question that his time in official detention at Valhalla "has not been credited against another sentence" since the State case was dismissed.  However, because Mr. Whitley was charged with an ostensibly unrelated State offense, it is our understanding that when calculating his release date the Bureau of Prisons will not credit Mr. Whitley for the initial six-month period of "official detention" in State custody even though he was arrested and interrogated "as a result of the offense for which the sentence [will be] imposed," and notwithstanding the fact that Valhalla also houses Federal inmates.

---

[4]     Notably, while Mr. Whitley served his initial period of detention with State inmates at the Westchester County Correctional Facility, that facility also houses Federal inmates as well.  For example, for those defendants facing prosecution in the White Plains division of the Southern District of New York, many serve their pretrial detention in that facility.

The Hon. Valerie E. Caproni
February 7, 2017
Page 14 of 15

If Mr. Whitley's State time had been served in a truly unrelated fashion, the undersigned would be hard pressed to argue that the prior time should be credited against his present sentence. However, there can be no dispute that when he was arrested on January 29, 2016, he was interrogated by both State and Federal law enforcement specifically in relation to his involvement in his present offense. The fact that the State – for reasons unknown to the defense – charged him with a separate offense may be technically true but it is also entirely irrelevant to the broader picture of what actually occurred. As such, while the Bureau of Prisons will not credit Mr. Whitley pursuant to 18 U.S.C. § 3585, we respectfully submit that this Court should nonetheless take his six-month period of official State detention into account when fashioning Mr. Whitley's sentence pursuant to 18 U.S.C. § 3553(a).

Thus, to ensure that Mr. Whitley is not required to serve a longer term of imprisonment then this Court believes necessary, we respectfully request that this Court incorporate a six-month downward variance into whatever sentence this Court ultimately imposes. For example, if this Court believes a 30-month Guideline sentence would otherwise be appropriate, then this Court should sentence Mr. Whitley to 24-months to account for the time served that the BOP will not be crediting him for. Similarly, if this Court determines that based upon Mr. Whitley's other 3553(a) factors a non-Guideline sentence of 20 months or even 12 months is sufficient, but not greater than necessary to otherwise serve the purposes of sentencing, then this Court should impose a sentence of 14 months or six months, respectively, to take such into account.

## VI.    Conclusion

This case presents a situation where the defendant has been convicted of a serious crime, but whose role in that offense is minor in comparison to his co-defendants. Despite his tremendous disadvantages in his life, and failure to always successfully overcome them, this is his first criminal offense and he will return to a tremendous level of support upon his release from incarceration. Indeed, we note that Mr. Whitley's family no longer lives in the South Bronx. They have relocated to the Lower East Side of Manhattan, which is where he will reside upon his release.

As is well known, the sentence imposed upon the defendant must be one that is sufficient, but not greater than necessary to satisfy the purposes of sentencing. Here, the undersigned respectfully submits that although Mr. Whitley has admitted his participation in a serious crime, the mitigating circumstances outlined herein outweigh the aggravating circumstances when considering what sentence to ultimately impose.

By the date of his sentencing, presently scheduled for February 21, 2017, Mr. Whitley will have been detained for nearly 13 months, six months in New York State custody and almost seven months in the custody of the Federal Bureau of Prisons. We respectfully submit that a sentence of "time served" would be appropriate in this case. Indeed, no greater sentence is necessary to be sufficient, but not greater than necessary, to comply with the purposes sentencing.

Even were this Court to conclude that a sentence of additional imprisonment is appropriate in this case, for all the reasons discussed above, we respectfully submit that a

The Hon. Valerie E. Caproni
February 7, 2017
Page 15 of 15

substantial downward variance remains warranted.   At an absolute minimum, this Court
downward should vary by six months to account for Mr. Whitley's time served in New York
State custody for which he will not otherwise receive credit.

As always, we thank Your Honor for her consideration in this matter.

Respectfully submitted,

Michael K. Bachrach
Karloff C. Commissiong
*Attorneys for the Defendant*
*Daryl Whitley*

cc:      All parties of record (by ECF)